# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SARAH J. GRANADOS, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL J. ASTRUE, ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) <br> ) | Case No: 09 C 7600 <br><br> Magistrate Judge Jeffrey Cole |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Sarah Granados, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2). Ms. Granados asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Ms. Granados applied for DIB on June 26, 2007, alleging that she had been disabled since September 2, 2005, due to depression, anxiety, and panic disorder. (Administrative Record ("R.") 90, 116). Her application was denied initially and upon reconsideration. (R. 42-48, 51-56). Ms. Granados continued pursuit of her claim by filing a timely request for hearing. (R. 62).

An administrative law judge ("ALJ") convened a hearing on June 9, 2009. (R. 25). Ms. Granados, represented by counsel, appeared and testified at the hearing. (R. 25). In addition, Mr. Mallick Mendrick testified as a vocational expert. (R. 25). On July 1, 2009, the ALJ issued a

decision finding that Ms. Granados was not disabled because she retained the capacity to perform jobs that exist in significant numbers in the national economy. (R. 17-24). This became the final decision of the Commissioner when the Appeals Council denied Ms. Granados's request for review on October 20, 2009. (R. 3-5). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Granados has filed an amended complaint appealing that decision under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Granados was born on September 27, 1977, making her thirty-one years old at the time of the ALJ's decision. (R. 90). She dropped out of school after 8th grade, but later got her GED. (R. 120). She had a child, and she says her parents then gave her the choice of whether she wanted to continue with school; she chose not to. (R. 28). She had several short-term retail store positions from 1994 to 2000. (R. 104). From 2000 until 2005, she worked as a special order representative in automotive parts sales. (R. 104). She lifted no more than ten pounds at a time in this job, and performed it mostly while sitting. (R. 106-07).

### B.
### Medical Evidence

Ms. Granados' life is not the stuff of a Norman Rockwell portrait. As already noted, she was a mother before high school and chose not to continue her education. Things did not improve at all from that unfortunate start. Her father was imprisoned for drug offenses. She is in a battle with her child's father for custody of her son. That man was living with a girlfriend

2

whose children were taken away by DCFS. She was taking care of her sister's two children because her sister, addicted to crack, neglected them. And she's been treated for several years for severe depression.

Ms. Granados was admitted to Ottawa Community Hospital for treatment of depression and anxiety in September of 2005. She related multiple problems: her father going to jail, relationship troubles with her boyfriend, and sexual harassment at work. (R. 183). Her mood was depressed, but she was not suicidal. (R. 183). Her thought process was organized. (R. 183). Dr. Michael Glavin diagnosed her with major depression and anxiety disorder, assigned her a GAF score of 40[1], and started her on a prescription for Xanax, Lexapro, and Lunesta. (R. 184). Also, Ms. Granados was referred to a "partial hospitalization program for group and individual therapy." (R. 186).

During these therapy sessions, Ms. Granados' GAF score ranged from 45-48 in the end of 2005, to 55 in June 2006. (R. 218-244). She generally reported mild to moderate sadness, and that she was very anxious. She continued to discuss her concerns about her father and relationship problems with her boyfriend. She took a road trip to Albuquerque, New Mexico,

---

[1] Clinicians use Global Assessment of Functioning, to report their judgment of the individual's overall level of functioning and carrying out activities of daily living. This information is useful in planning treatment and measuring its impact, and in predicting outcome. It's done on a 100-point scale. A score of 31-40 is indicative of "[some impairment in reality testing or communication ( e.g., speech is at times illogical, obscure, or irrelevant ) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood ( e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school )." From 41-50, an individual has "[severe symptoms ( e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational or school functioning ( e.g., no friends, unable to keep a job )." At the next level, 51-60, an individual has "[moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers )." http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

with a girl friend. (R. 222). She worked on getting her GED, and spent time walking, biking and playing tennis. (R. 223-224). During one session, she told her therapist that Dr. Glavin recommended she apply for disability and that she had already been granted benefits. (R. 243). She also explained that she lost her job due to the stress she was going through, and was taking care of her mother. (R. 243).

On February 24, 2006, Mark Langgut, Ph.D., performed a consultative psychological evaluation in connection with Ms. Granados' application for benefits. (R. 192). Ms. Granados reported experiencing sadness, hopelessness, lethargy, sleeplessness, anhedonia, decreased concentration, impaired decision-making, and irritability. (R. 194). Testing revealed her memory skills were intact. (R. 193). She had no ability to perform simple mathematic calculations. (R. 194). She could not explain the meaning of proverbs. (R. 194). Dr. Langgut thought she might have significant difficulty with forming generalizations and understanding concepts. (R. 194). Her judgment was mildly impaired, as was her insight into her own situation. (R. 194). She exhibited some mild persecutory delusions and moderately intense phobias of being out in public. (R. 194).

Psychologist Patricia Beers reviewed the medical record as of May 3, 2006. She thought Ms. Granados had mild restrictions in her activities of daily living, mild restrictions in maintaining concentration, moderate difficulties in social functioning, and one or two episodes of extended decompensation. (R. 206). Dr. Beers also found Ms. Granados was moderately limited in her ability to work with others, interact appropriately with the general public, accept instructions and respond to criticism, and travel to unfamiliar places and use public transit. (R.

210-11). Dr. Beers thought she could understand, recall and execute most instructions, and perform work if she were in a socially restrictive vocational setting. (R. 212).

One of Ms. Granados' therapists, Lynn Ballinger – who saw Ms. Granados from January through November in 2006 – filled out a questionnaire about her condition in November 2006. (R. 411). Ms. Ballinger said Ms. Granados had bipolar disorder and major depressive disorder with anxiety, and that her GAF – and highest GAF over the last year – was 55. (R. 411). Insight was limited, affect was depressed and anxious, and judgment was "okay." (R. 411). There was some evidence of paranoia. (R. 411). Ms. Ballinger also checked off a laundry list of Ms. Granados' reported complaints: panic attacks, decreased energy, anhedonia, sleep disturbance, emotional lability, social withdrawal, generalized anxiety feelings of guilt, difficulty concentrating, appetite disturbance, and blunt affect. (R. 411). Ms. Ballinger felt Ms. Granados was moderately limited in activities of daily living, and decompensation in work-like settings, and markedly limited in social functioning and concentration. (R 412). She also said Ms. Granados could not even do part-time work at that point "due to high anxiety, depression, and adjustment to medication." (R. 412).

Ms. Granados was back in the hospital for her psychological problems in May 2007. (R. 544). Her mood was labile, and she was anxious, tearful, and irritable. (R. 544). Her thought process showed some disruption, and her concentration and memory were somewhat decreased. (R. 544). Her judgment and insight were impaired. (R. 544). She was abusing her Xanax – taking an entire prescription in a short period – and was not functioning at work. (R. 544). She was also buying Xanax on the street and using marijuana. (R. 544). Her GAF was 30. (R. 545). She was placed on Seroquel, Cymbalta, and Buspar. (R. 550).

5

Following her hospitalization, Ms. Granados was back in therapy with Ms. Granados. She skipped several appointments, one because her house was burglarized. (R. 526-29). She also was having trouble taking off work to make sessions. (R. 525). She said she really enjoyed her job working at a bar. (R. 525). During the first part of 2008, her GAF ranged from 40 on March 26, to 58 on March 12, and June 4. (R. 520-529).

On October 28, 2008, Ms. Granados told Ms. Ballinger that she had not taken her medication for two months because she didn't want to. (R. 530). She said things were going well with her boyfriend. (R. 530). Thought process was linear, impulse control was fair, insight was fair, and judgment was normal. (R. 530). Although mood was depressed, affect was appropriate and memory was intact. (R. 530). GAF was 50. (R. 530).

On January 26, 2009, Ms. Granados reported that she had to take care of two of her sister's children because her sister was staying out all night smoking crack. (R. 532). Mood was anxious and depressed. (R. 532). Insight was fair, judgment was normal, and memory was intact. (R. 532). GAF was 48. (R. 532).

In February 2009, Ms. Granados again indicated that her relationship with her boyfriend was going well. (R. 536). The bar she worked at had closed for the winter. (R. 536). There was some anxiety, but minimal depression and mood swings. (R. 536). She was "stable overall." (R. 536). Insight and judgment were good, and memory was intact. (R. 536). GAF score was 45. (R. 536).

Things remained essentially the same, but in April 2009, Ms. Granados reported that she was pregnant. (R. 535). She was very anxious and confused about this. GAF score was 48. (R. 535).

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the hearing, Ms. Granados explained that she dropped out of school after eighth grade because:

> I had the choice. I was given the choice. My parents – my mother didn't make me go to school. Also I had a baby.

(R. 28). She also said she had taken special education classes in school. (R. 29). Her parents raised her son.[2] (R. 31). Her son did live with her now, however.

Ms. Granados testified that, on a typical day, she got up at various times – perhaps 8 a.m., perhaps 2 p.m. (R. 29). She did housework sometimes, but her boyfriend and son would help her. (R. 30). She said she doesn't leave the house. (R. 30). She had friends but didn't see them; they only spoke on the phone. (R. 31). Sometimes she didn't shower for days. (R. 33). She watched some TV, sometimes used a computer, but rarely read anything. (R. 32). She had trouble sleeping, and sometimes went for a few nights without sleep. (R. 34).

She explained that she had trouble remembering to take her medicine; her mother or boyfriend had to remind her. (R. 33). At the time of the hearing, she was on Ambien, Buspar, and Prozac (R. 34), but said she hadn't taken them that day. (R. 40). Not because she forgot, but because she chose not to. (R. 40). She said the pills sometimes made her sick. (R. 40). The Prozac caused nausea and dizziness, and the Buspar caused nausea and shaking. (R. 36). She did not think the medications were working. (R. 36).

---

[2] Ms. Granados told Dr. Langgut she raised her son on her own. (R. 193).

## 2.
## Vocational Expert's Testimony

The ALJ asked the vocational expert (VE), Mr. Mallick, to assume an individual like Ms. Granados had the capacity to perform medium work, involving no more than one- or two-step tasks with only occasional contact with the public, co-workers, and supervisors. (R. 38). The ALJ asked whether such a person could perform any of Ms. Granados' past work. (R. 38). The VE said she could not. (R. 38). There were other jobs in the regional economy that such an individual could perform, however, including: hand packager (7600 positions in Illinois); order picker (17,800); marker/labeler (10,800); pricer (65,800). Ms. Granados' counsel asked if such a person could hold down a job if they missed work three times a week. (R. 40). Obviously, the answer was "no." (R. 40).

## D.
## ALJ's Decision

The ALJ found that Ms. Granados suffered from the following severe impairments: depression, anxiety, panic disorder, and endometriosis. (R. 19). Next, after summarizing the evidence in the medical record, he further found that these impairments did not meet or equal a listed impairment, specifically listings 12.04 and 12.06, covering affective disorders and anxiety related disorders. (R. 21). He thought she had, at most, a mild limitation in daily activities, because she worked at a bar, cared for her child, and did housework. He thought she had moderate difficulties in social functioning because she said she did not go out much, yet also was able to work at a bar. So she would not be prevented from occasional contact with others in a work setting. The ALJ also found a moderate limitation on concentration, but added that this would not prevent her from performing simple one- or two-step tasks. The ALJ found no

evidence of repeated episodes of decompensation. (R. 21). He determined that Ms. Granados had the residual functional capacity for medium work that was limited to one- or two-step tasks and involving only occasional contact with co-workers, or the public. (R. 21).

The ALJ noted that he had considered Ms. Granados' symptoms and testimony in light of all the applicable regulations and Social Security Rulings. (R. 21-22). He thought the level of her alleged restrictions was not consistent with the medical evidence or her activities. For example, she said she did not leave the house, but yet she worked part-time at a bar. (R. 22). She also pursued a GED and went on a road trip. (R. 22). He noted that she was not always compliant with medication and functioned better when she was. (R. 22). Finally, the ALJ noted the VE's testimony as to the significant number of jobs in the regional economy that a person with Ms. Granados' RFC could perform. Based on this testimony, he concluded that Ms. Granados was not disabled. (R. 24).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is

disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The court has called it a "lax" standard. *Berger*, 516 F.3d at 544.

## B.
## Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

10

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

Ms. Granados raises a number of issues with the ALJ's decision. Some are "nit-picking", *see Rice v. Barnhart*, 383 F.3d 363, 369 (7th Cir. 2004), some are assertions without any citation to factual or legal support, and some aren't sufficiently developed to address. At least one has traction, however: the manner in which the ALJ rejected the opinions of long-term care-givers – a psychiatrist and a therapist – that Ms. Granados was unable to work.

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the

treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with the patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon,* 270 F.3d at 1177. The Seventh Circuit has expressed some puzzlement about the rule:

> Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.

*Hofslien*, 439 F.3d at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well. *Id.* at 377; 20 C.F.R. § 404.1527(d). Simply put, if an ALJ does not give the treating physician's opinion controlling weight, he has to provide "good reasons" for how much weight he accords it. *Scahaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007). Ms. Ballinger's opinion is not entitled to the weight that Dr. Glavin's is, but can't be rejected out of hand either. *See* 20 C.F.R. §404.1513(d).

Here, the ALJ found that Dr. Glavin's opinion that Ms. Granados could not work was not consistent with the evidence of the record as a whole. He rejected the same opinion from the therapist, Ms. Ballinger, for the same reason. In explaining this, the ALJ noted that Ms. Granados' GAF scores were "primarily at 55." (R. 20). GAF scores are not the be-all and end-

12

all of a psychological impairment case, as they are used by mental health professionals primarily for planning treatment. Because they reflect the mental health professional's opinion of both severity of symptoms *and* functional level, with the score addressing the worse of the two, the score do not always reflect the level of functioning, *i.e*, functioning might be higher than severity of symptoms  See *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). By the same token, it is likely one of the only things one might find in a record in a psychological impairment case that gives some inkling into severity of impairment and capacity for work. There are no MRIs or CT scans in these cases. Instead, there are endless jottings detailing a claimant's complaints about family and friends, whether they are "sad" or "doing better" or "doing worse." These are no doubt helpful to the mental health professional in following and dictating course of treatment, but are rarely very helpful in determining whether someone is capable or incapable of working.

Having focused on the GAF scores, the ALJ had to employ them correctly. Saying they were "primarily at 55" was something of a stretch. From September 2005 through June 2006, Ms. Granados' GAF score reached 55 on just four occasions: May 10, 2006; June 13 and 26, 2006; and April 28, 2006. (R. 228, 219, 218, 232). On seventeen other occasions during that period, it was never over 50. (R. 184, 220-27, 229-30, 233-245). Thereafter, recorded GAF scores were 55 in November 2006 (R. 411), 58 and 40 in March 2008, and 58 in June 2008, 50 in October 2008, 48 in January 2009, and 48 and 48 in March 2009. (R. 520-537). And, there was one occasion, in May 2007, when Ms. Granados was abusing Xanax, that her GAF was just 30. (R. 544-45). So, in the course of about four years of treatment, Ms. Granados' GAF was assessed at 55 or above just seven times, as against twenty-three times when it was 50 or less.

The ALJ mischaracterized the evidence in rejecting the two opinions of the care-givers that treated Ms. Granados over this extended period.

Moreover, even if Ms. Granados' GAF score was consistently 55, that would not contradict the opinions of Dr. Glavin and Ms. Ballinger. As already noted, a GAF score of 55 indicates moderate symptoms such as flat affect and circumstantial speech, or occasional panic attacks, or moderate difficulty in social, occupational, or school functioning. Just below that, a GAF score of 41-50 translates to severe symptoms like suicidal ideation or obsessional rituals, or any serious impairment in social, occupational or school functioning, such as being unable to keep a job – that's where Ms. Granados actually was nearly all of the time. But even the few, isolated 55s that the ALJ hung his hat on would mean she was just barely at a level suggesting someone could work or live independently. That doesn't really contradict Dr. Glavin's assessment. *See Goble v. Astrue*, 2010 WL 2776563, *6 (7th Cir. 2010)(GAF score of 58 is not inconsistent with disability but suggests someone who may be barely above the level of being able to work or live independently).

Beyond that, the fact that her perceived level of functioning, as reflected by the snapshot that is a GAF score occasionally made its way as high as 55 or 58 is not a valid reason to discredit the opinions of her treating psychiatrist and therapist. The Commissioner's own regulations acknowledge the cyclical nature of such impairments. In the case of mental disorders, the regulations state a clear preference for "longitudinal evidence":

> Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time.

14

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(2). The Seventh Circuit, too, has warned ALJs not to put too much stock in isolated positive or optimistic assessments of a claimant's psychiatric condition. In *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006), the claimant suffered from bipolar disorder and was a substance abuser. Judge Posner took issue with the ALJ's focus on what the claimant's therapists had jotted down during her sessions:

> He thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.

454 F.3d at 629. Similarly, in *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), Judge Posner had this to say about another ALJ reading too much into treatment notes:

> What seems to have made the biggest impression on the administrative law judge, but suggests a lack of understanding of bipolar disorder, was that [the treating psychiatrist's] treatment notes, which back up the report in which she concludes that the plaintiff cannot work full time, contain a number of hopeful remarks. They are either remarks the plaintiff made to [the doctor] during office visits or [the doctor's] independent observations – the plaintiff's memory was "ok," her sleep fair, she was doing "fairly well," her "reported level of function was found to have improved," she had "a brighter affect and increased energy," she "was doing quite well." On the basis of such remarks the administrative law judge concluded: "little weight is given the assessment of [the treating psychiatrist]."

*Bauer*, 532 F.3d at 609.

Ms. Granados may not be bipolar, but she nonetheless suffers from an array of psychological impairments that are cyclical. She may have good and bad periods. And here, her "good" periods – for the ALJ those sessions where her GAF score was said to be 55 or so – were not even all that "good," relatively speaking. And, importantly for our purposes, did not undermine the opinions expressed by the psychiatrist of therapist.

15

The ALJ did mention a few other things besides the GAF scores that may or may not have entered into his decision to discredit the opinions of the treating psychiatrist and therapist, but it's difficult to tell whether they did. Once he went through that portion of his analysis, he did point out that she worked part-time at a bar and had been found to be abusing Xanax and smoking marijuana at one point in the course of her treatment. (R. 20-21).[3] But the only specific reason he linked to his decision was the GAF scores. Maybe the additional factors played a role in the ALJ's analysis, maybe not. This is a good example of failing to build a "logical bridge" between the evidence and the conclusion.

Also, the part-time job is a bit of a sticking point in this case, because the ALJ also mentioned it when discrediting Ms. Granados' testimony. (R. 22). We don't know much about it at all. We have no idea what the job entailed, what Ms. Granados' duties or hours might have been. We know the work was part-time and seasonal. We also know that her boyfriend helped out. But that's about it. For whatever reason, the ALJ didn't ask Ms. Granados anything about this work at the hearing – the hearing was exceedingly brief, as these things go, barely twenty minutes (R. 27, 41) with the transcript of the questions to Ms. Granados covering about ten pages. In short, it might not be the type of job activity to place much emphasis on in when assessing whether a claimant is disabled. *See Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir. 2003); *Wilder v. Chater*, 64 F.3d 335, 338 (7th Cir. 1995).

---

[3] These points, while they follow the ALJ's rejection of the treating sources' opinions in the text of his decision, are grouped with some other points that do not detract from those opinions: that Ms. Granados stopped taking her medication while pregnant – certainly a valid reason to do so – and that she had anger issues and problems in her relationships. This further obscures whether the part-time job and the Xanax abuse played a role in the ALJ's weighing of the treating sources' opinions.

It also bears noting that, in addition to the part-time job, the ALJ also mentioned the fact that Ms. Granados lived with her son and her boyfriend, did housework with help from her boyfriend, watches televison, and cares for her personal hygiene. (R. 22). The ALJ said that these activities are "consistent with the performance of the restricted range of medium work [limited to one- and two-step tasks and occasional contact with co-workers and the public]." (R. 22). That's something of a leap.

Actually, Ms. Granados' testimony regarding housework suggests she was extremely limited. When asked if she did any housework at all, she said: "Sometimes, but I don't have to do it. I don't - - I have a boyfriend that will do, it if I don't do it." (R. 30). She added that her son helped as well. (R. 30). But limited activities like that, and caring for her personal hygiene and her son cannot really be equated with the capacity to hold down a full-time, 40-hour-a-week medium job. *Bauer v. Astrue*, 532 F.3d 606, 608 -09 (7th Cir. 2008); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005). So both the ALJ's treatment of Ms. Granados's credibility and the treating source's opinions are similarly flawed, requiring a remand.

## V.
## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

**ENTERED:** _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 2/24/11